MAY v. HILL.

1. NEGLIGENCE—INJURIES TO CHILD—MILK WAGON—NEGLIGENCE
   OF DRIVER—QUESTION FOR JURY.
      In an action by a child against the alleged owner of a milk
      wagon for injuries resulting from being knocked down by
      the team in the street, evidence examined, and *held*, to pre-
      sent a question for the jury whether the driver was negligent
      in failing to see the child.

2. SAME—OWNERSHIP OF WAGON—EVIDENCE—SUFFICIENCY.
      In an action against a father for a tort committed by his minor
      son in charge of a milk wagon, evidence relative to the own-
      ership of the milk route and the father's interest therein ex-
      amined, and *held*, that a verdict against the father was so
      clearly against the weight of the evidence that defendant's
      motion for a new trial should have been granted.

Error to Kent; Perkins, J. Submitted February 24,
1908. (Docket No. 139.) Decided March 31, 1908.

Case by Ruth E. May, by next friend, against David
Hill for personal injuries. There was judgment for
plaintiff, and defendant brings error. Reversed.

*E. J. Doyle* (*John J. McKenna*, of counsel), for ap-
pellant.

*Emil B. Gansser* (*Cornelius Hoffius*, of counsel), for
appellee.

HOOKER, J. The plaintiff, a child, was injured while
crossing a city street by being struck, thrown down, and
stepped on by one of a span of horses being driven before
a milk wagon by one Grover Hill, a minor son of the de-
fendant. She recovered a judgment of $400 in an action
for negligence, and the defendant has appealed. The
declaration alleges that defendant was the sole owner of
the milk rig and business, and that in driving the team

Grover Hill was the defendant's agent. The defendant claimed upon the trial that he had no share in the milk rig or business, and that Grover Hill was not his agent in driving the team. The important question is whether the circuit judge erred in refusing to direct a verdict for the defendant, which counsel claim that he should have done upon two grounds, viz.: *First.* There was no proof that Grover Hill was negligent. *Second.* There was no proof that he was defendant's agent.

· 1. Negligence. The wagon was inclosed with windows in front. One witness testified to seeing the accident. He stated that the girl was starting to cross the street, and Hill crossed the street from the other side, and drove right up against the gutter on a kind of fast trot. She started to run back to the walk and when in the gutter she was struck by the knee of the near horse and knocked down. The horse stepped over the girl and afterwards in prancing about stepped on her hand. Grover Hill testified that his team was walking and that he did not see the child because she was so small, that she ran from the sidewalk in front of the wheels and he did not see her until the horse knocked her down and that she was too small to be seen in front of the horses. He said that he was paying particular attention to his team and stopped them quick, that they swung to the side to avoid hitting her, which must have been toward the gutter as the team was going north on the east side of the street, and she was struck by the near horse. The surrounding conditions and the details were given more fully than as stated, but we have given sufficient to indicate that there was a question for the jury to determine, i. e., whether Hill was negligent in failing to see the child. We are of the opinion that the court did not err in refusing to take that question from the jury if there was testimony charging the defendant with this negligence.

2. Defendant's responsibility. To prove defendant's liability counsel for the plaintiff called two witnesses. Emerson Scott was a constable who served the declaration

on the defendant. He testified that at that time he "asked defendant if he *owned the milk route*, and that he said *no, he didn't own it, but he was interested in it, he said him and the boy owned it together.*" On cross-examination he said:

"Mr. Gansser went with me, I started the conversation and Mr. Gansser then told him who he was, and he had quite a lengthy conversation with him after that.

"*Q. He told him that he didn't own the milk route?*

"*A. He said, ' Well, I don't own it, but I am interested in it.'* I believe these are just the remarks he made.

"*Q. Those are the words he used?*

"*A. I think so, as near as I can remember. He said the boy and I together own it.*"

He said further:

"I don't remember how I came to ask him those questions. Mr. Gansser may have told me to ask him those questions.

"*Q.* Then he told you the questions to ask him?

"*A.* Yes, but he didn't say that he wanted him to admit anything. I don't know what his object was, I done as he told me, I was under his orders.

"*Q.* You say you asked Mr. Hill that day you went out there to serve the papers if he had an interest, if he owned this milk route?

"*A.* Yes.

"*Q. And he told you that he did not?*

"*A.* Yes, *that was the word he said.*

"*Q.* That he *had an interest in it?*

"*A.* Yes."

He testified further:

"*Q.* Now are those the words he used?

"*A.* I think those are the exact words, as near as I remember them. I believe Mr. Hill and Mr. Gansser went into the house to look up the record to see how old the boy was. Hill told Gansser he thought he was of age, and then to prove it I think they went into the house together to look up some records. I have told substantially all the conversation had with Mr. Hill. We were there about ten minutes altogether. I didn't get out of the buggy; Gansser got out, they didn't stand at the buggy

and talk, they went into the house, I didn't hear the conversation between Gansser and Hill, only just a few words before he got out of the buggy.

" *Q.* What part of the conversation did you hear between Gansser and Hill?

"*A.* Well, I don't just remember, it was in regard to the boy's age, and some little talk whether he owned the route, or whether he didn't, but I didn't pay any attention to it, I don't think I could remember what it was.

" *Q.* Did Hill say there is a milk route here, but the boy owns it?

"*A.* He didn't tell me, I think he told Mr. Gansser that the boy bought all his milk to run the route or something like that, I didn't hear who he bought it of. That was all practically I heard. He was talking to Gansser, they talked there before they went into the house maybe five minutes. * * *

" *Q.* All he said in your hearing was, Do you own the milk route? ·

"*A.* I said that.

" *Q.* And he said no?

"*A.* He made those remarks, he finished the sentence; he said 'no, I don't own it, but I am interested in it.'

" *Q.* That is all you heard during five minutes' talk there?

"*A.* Practically all I could swear to, I heard them talking, but I didn't understand what it was."

Redirect examination:

" I heard something about the boy's age, about whether he was of age or not. He said they had it in the Bible, I heard that, yes."

Gansser (who was plaintiff's attorney) testified that he was present when Scott served the declaration, and continued as follows:

" *Q.* At that time was there any conversation between yourself and Mr. Hill there, or between Scott and Mr. Hill as to the ownership of the milk route?

" *A.* Well, I think that Mr. Scott asked him, in fact, I know he asked him, if he owned the milk route, and he said at first no, but I have an interest in it, he said I have an interest in it with the boy, that was what he said.

" *Q.* Anything further on that line?

"*A.* Why, not a thing that I know of; he said the boy got some part of his milk from him, and that he purchased it from different neighbors around there, I think he said the boy made his home with him. The boy is the son of David by a former wife, he is the one that drives the milk route around the city of Grand Rapids, he is not married, but stayed at home with his father at that time."

Cross-examination:

"Mr. Scott asked Mr. Hill the question in my presence if he owned that milk route. I could not say as to whether it was at my request, he didn't say I don't, but he said, 'no, I am interested in it with the boy,' that was what he said."

The record shows that Grover Hill obtained some, perhaps all, the money that was paid for the milk route and other property from his father; that he lived at his father's, who furnished hay, but not grain, for the team. This testimony was contradicted except as to the furnishing of money, which defendant said had been repaid as far as he wanted it.

The only testimony which tends fairly to show that defendant was an owner or part owner of the milk route, or was conducting the business, was the statement that he was a part owner in the testimony of Scott, that he and the boy owned it together, and Gansser's testimony that he said he was interested in the milk route with the boy. In order to sustain this verdict we must say that the statement: "No, I don't own it, but I am interested in it; the boy and I together own it," must make a prima facie case. When we consider the fact that this defendant was evidently aiding his son in establishing himself in business, that he had advanced money to purchase it, and had allowed him to use his team, helped him to purchase a second horse, for which the son is clearly shown to have been indebted to him, what he said to plaintiff's lawyer, and the officer, is as consistent with defendant's claim that he was not an owner or part owner in the business as that he was. He was not asked about the con-

duct of the business, but only whether he owned the milk route, which, if he did, would not prove that his son was acting as his agent or partner in running it. A man who aids his son to start in life for himself by allowing him to use a team and milk route for his own benefit, though owned by the father and not by the son, does not thereby necessarily make his son his agent, nor is there in such case any such presumption, and he may truthfully say that he is interested in it, or if the son owns one horse and the father another, he may say that they own it together, without thereby justifying the claim that he is liable for the torts of the son in conducting the business or the contracts that he may make in connection with it.

While it is true that these statements of the defendant must be construed in the light of the surrounding circumstances and there may be a difference of opinion as to whether the question should have gone to the jury, the verdict is so clearly against the weight of the evidence and unjust that a new trial should have been granted on defendant's motion.

The judgment is reversed, and a new trial ordered.

GRANT, C. J., and MOORE, CARPENTER. and McALVAY, JJ., concurred.